**COMMONWEALTH of Kentucky, Appellant,**

v.

**Ward BURNETTE, John D. Wolf and John Kelly, Appellees.**

**No. 92–SC–161–DG.**

Supreme Court of Kentucky.

Feb. 24, 1994.

Rehearing Denied June 23, 1994.

Chris Gorman, Atty. Gen., Michael L. Harned, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellant.

M. Gail Robinson, Kevin M. McNally, Frankfort, for appellee, Burnette.

William E. Johnson, Richard M. Guarnieri, David C. Schwetschenau, Stoll, Keenon & Park, Frankfort, for appellee, Wolf.

Frank E. Haddad, Jr., Louisville, for appellee, Kelly.

LEIBSON, Justice.

Ward Burnette and John D. Wolf were convicted in the Franklin Circuit Court of theft by deception and were sentenced to fines of $5,000 for their part in deceiving the Commonwealth into paying $5,435.79 for two unauthorized chartered airplane flights taken in December, 1987. John Kelly was convicted of complicity to theft by deception and sentenced to a fine of $2,500 for his part in promoting the deception. These convictions were reversed by the Court of Appeals. We granted discretionary review and, as there was ample evidence to support the convictions, reverse the Court of Appeals and affirm the judgments entered by the trial court.

Burnette was elected Commissioner of Agriculture in November 1987. Wolf had taken a leave of absence from his job in the Department of Agriculture from September, 1987 to January, 1988; however he was still on the state payroll. There was testimony that during his leave of absence Wolf had no official function with the Department of Agriculture. Wolf was subsequently appointed as the Deputy Commissioner of Agriculture.

On December 14 and 15, 1987, after the election but prior to Burnette's assuming office, Burnette, Wolf, and two other private citizens, Bruce Harper (farm manager for then Governor–Elect Wallace Wilkinson) and Harold Duckworth (a Cynthiana farmer), took two privately chartered airplane flights from Lexington, Kentucky. There was testimony that the men first flew to Chicago and met with officials of the American Haytech Corporation who had earlier expressed an interest to Duckworth in the possibility of developing a hay processing facility in Cynthiana. There was also testimony that the next day the same group flew to Washington, D.C. and met with officials of the Foreign Agriculture Service with the United States Department of Agriculture. However, John Moore, Assistant Director of Administrative Services of the Kentucky Agriculture Department, testified that he had talked to Wolf several times regarding the bill and that no mention was made of the hay program which was the claimed purpose of these trips. During one conversation with Wolf, Burnette was also present and Burnette and Wolf talked about the flight and that it was a "celebration" for the election.

Both chartered flights were arranged at Harper's request by Angela Hicks, an employee of Wilkinson Flying Service. Hicks testified, and Harper denied, that Harper instructed her to list the flight dates as January 4 and 5 because the Department of Agriculture might not pay for flights taken in December before Burnette took office.

Angelina Bennett, an employee of the Department of Agriculture, received the bill for processing. She testified that the dates caught her attention because one of the dates was the same day Burnette was in Frankfort being sworn in as Agriculture Commissioner. An additional problem was that the bill was on Wilkinson Flying Service stationery—a potential conflict of interest if the Governor's company was doing business with the state.

Burnette and Wolf subsequently met with Rogers Wells, the Secretary of Finance and Administration. Burnette asked Wells if Wells could help him get the bill paid and told Wells that, although the bill was from Wilkinson Flying Service, the plane did not belong to Wilkinson Flying Service. Appellees Burnette and Wolf testified that Burnette told Wells that the flights were in December, 1987. However, Wells testified that neither Burnette nor Wolf told him that the January dates were erroneous.

Wells turned the bills over to his chief assistant, appellee Kelly. Wells testified that he told Kelly that the Commonwealth could not pay for a flight by a plane owned by the Governor and directed him to pay the invoices if they should be paid, and, if not, to reject them.

Kelly contacted Angela Hicks, who informed him that the plane was actually owned by Central Rock Company. Hicks testified that Kelly instructed her to submit new invoices from Central Rock and to leave Harper off the passenger list. She also testified that Kelly told her he did not want the bill to indicate the flights had occurred only one day apart and to alter the flight dates to January 14 and 20. Hicks further testified that Kelly said he did not want to know when the trips actually occurred and did not comment when she told him they were taken in December. Kelly testified that he only asked Hicks to change the bills to Central Rock letterhead after learning that Central Rock, not Wilkinson Flying Service, owned the plane and denied asking Hicks to change the dates because they were unimportant to him; only the Wilkinson letterhead was a problem.

Hicks changed the dates to January 14 and 20, 1988, left Harper's name off the passenger list and sent the new bills, on Central Rock letterhead, to Military Affairs. Military Affairs pays for all state government flights and is then reimbursed by the appropriate agencies. Military Affairs questioned the bills because they were not accompanied by certain forms which should have been sent by the Agriculture Department. The invoices were ultimately paid, however, following Burnette's assurances that the appropriate forms would be forwarded. Military Affairs issued a $5,435.79 check to Central Rock for the two flights.

The inter-account bill sent by Military Affairs to the Agriculture Department was ap-

proved by Wolf, and Military Affairs was reimbursed by Agriculture Department funds. The events in question came to light during an annual audit of the Agriculture Department when it was noted that Burnette was in Hopkinsville on the day given for the first flight and in Atlanta on the day given for the second flight.

Burnette and Wolf were charged with theft by deception for making the two unauthorized flights and then charging the flights to the Commonwealth and creating a false impression as to their authority to do so. This false impression was created through invoices bearing false information indicating that the flights had been taken after the date Burnette had taken office as Commissioner of Agriculture. Kelly was charged with complicity to theft by deception by directing Wilkinson Flying Service personnel to resubmit the bill on an invoice from a different company and to include information on the invoice which he knew was inaccurate. The jury found all three men guilty. Harper was also charged with complicity to theft by deception but was acquitted.

KRS 514.040, Theft by Deception, reads in pertinent part:

(1) A person is guilty of theft by deception when he obtains property ... of another by deception with intent to deprive him thereof. A person deceives when he intentionally;

(a) Creates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind;

. . . . .

(c) Fails to correct a false impression which the deceiver previously created or reinforced or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship ...

The evidence shows that Burnette, Wolf and Kelly induced false invoices to be prepared and submitted through channels and failed to correct the false impressions those invoices created as to the dates of the flights. These false invoices specified flight dates in January 1988, dates which, if true, would have justified payment of the charges incurred, because Burnette was at that time Commissioner of Agriculture. The Department of Military Affairs issued a check to Central Rock in payment of the false invoices.

Burnette knew theft by deception had occurred. When interviewed by State Police during their investigation in this matter, Burnette admitted he "had no authority" to incur an expense of this nature on behalf of the Commonwealth of Kentucky at the time the flights were taken. There was ample evidence from which the jury could find all three appellees knew of the deceptive bills.

Although the statute is "silent on the question of the necessity of victim's reliance on the false impression," reliance is "a necessary element under KRS 514.040." *Brown v. Commonwealth*, Ky., 656 S.W.2d 727, 728 (1983). The Court of Appeals reversed the convictions because Secretary of Finance Rogers Wells "testified that the erroneous flight dates were of no consequence when considering payment." Actually, Wells testified that *if* the facts were as the defense attorneys put them and *if* the proper documentation were provided, then he would have approved payment of the bills. Also, Wells went on to testify that he would have had to consult with his attorney to determine if an incoming commissioner and an on leave employee would have been eligible for reimbursement since he had not looked into the matter that closely. The Adjutant General testified that had he known the true dates of the flight, it would have been an issue. The evidence remains that neither Wells nor Military Affairs was given the opportunity to approve payment for the actual flights and determine if they should pay for flights before Burnette became Commissioner. The proper documentation for December flights was also never provided. Thus, payment to Central Rock was made in reliance on the erroneous flight dates.

■ Appellees point out KRS 514.040(2), which provides:

"The term 'deceive' does not, however, include falsity as to matters having no pecuniary significance...."

Burnette and Wells claim, of course, that the trips were intended to benefit the Department of Agriculture and that Wells's testimony shows the flights would have been paid for even had the correct dates been known. However, the only Department of Agriculture employee on the trips was Wolf and he was on an extended leave of absence at the time. Testimony indicated that only two people within the Agriculture Department had the authority to authorize plane flights in December 1987, and no one on the trip was authorized by either of those persons to conduct any business or perform any official service for either the Department or for the Commonwealth at that time. The flights were wholly unauthorized.

Whether these flights were for personal or for public benefit, or for both, is beside the point. If indeed the four persons on board on these trips were seeking to confer a benefit on the State of Kentucky, they were doing so as private citizens and not as "persons in the official service of the Commonwealth," as required by 200 KAR 2:006, Sec. 2(3) before being eligible for reimbursement.[1] In addition 200 KAR 2:006, Sec. 4(1) provides that travel must be authorized in advance.[2] These flights were not authorized in advance.

The false statements made to obtain payment for these flights obviously had "pecuniary significance." Unless the dates were changed, payment from state funds was not authorized. Everyone concerned in this deception was well aware of this fact, including Finance Secretary Wells who testified after the fact that if the facts were as the defense attorneys stated them and if he received the proper documentation, he would have authorized payment for these flights even though they took place in December. As a matter of law this means, at most, he would have done so if he could have done so. No statute or regulation empowered him to do so.

Roger Wells had no authority as Finance Secretary to accept responsibility on behalf of the Commonwealth of Kentucky for payment for these flights, even had he so chose when the invoices were presented.

There is no provision of the law recognizing the Commissioner of Finance as the final arbiter of the legality of a claim against the Commonwealth. *Raney v. Stovall,* Ky., 361 S.W.2d 518, 520 (1962).

The Secretary of Finance makes the final interpretation of the travel expense and reimbursement *regulations,* 200 KAR 2:006, Sec. 2(4), and KRS 42.012, designates the Secretary of the Finance and Administration Cabinet as "the chief financial officer of the state" and specifies that he shall "protect the financial interest of the state," but nothing in either 200 KAR 2.006 or KRS 42.012, together or separately, authorized payment at the time the flights were made or provided authority for the Secretary of Finance to authorize payment after the fact.

Wells' testimony at trial was a weak effort to explain the unexplainable, and the jury recognized it as such. His testimony had no evidentiary value, but assuming the contrary, at most it created an evidentiary conflict with other evidence explaining the procedure necessary to authorize and obtain payment for chartered flights, testimony from Michael Davidson, the Adjutant General, and Hank Lindsay, Director of Air Transport for Military Affairs, the agency charged with responsibility for processing payment for state government charter flights. Wells' evidence falls far short of providing a reason to hold there was a failure of proof that a theft took place.

Contrary to appellees' contention, and unlike the victims in *Rowland v. Commonwealth,* Ky., 355 S.W.2d 292 (1962) and *Palmer v. Commonwealth,* Ky., 479 S.W.2d 613 (1972), the Commonwealth did not receive that for which it paid. Military Affairs paid Central Rock and was reimbursed by the Agriculture Department for what appeared to be January trips by the Commissioner of Agriculture to represent the Com-

---

1. "... no reimbursement can be claimed for expenses of any person other than employees, bona fide wards, or other persons in the official service of the Commonwealth. Only necessary expenses of official travel will be reimbursed."

2. No travel expense shall be reimbursed unless the travel was authorized in advance as follows: (a) Travel ... within the other forty-nine (49) states ... must be authorized by the agency head or a designated representative...

monwealth on official business. The Commonwealth received trips taken in December by private individuals who had no authority to conduct Agriculture Department business.

*Frazier v. Commonwealth*, 291 Ky. 467, 165 S.W.2d 33 (1942) recognized that the victim, or someone on behalf of the victim, cannot condone a theft by deception after it occurs and thus excuse the crime.

> The inherent error in appellant's argument is the assumption that criminal prosecutions are for the protection and benefit of the person injured. The true purpose is to protect the public by punishing the criminal and preventing crime. The gist of the offense of obtaining money or property of another by false pretenses is the fraud and deception of the perpetrator, his motives and the results—the fact that a person was deceived and defrauded. (Citations omitted.) *Frazier* at 34.

It was not Wells' money that was stolen; it was money belonging to the Commonwealth of Kentucky, and Wells cannot condone the crime.

■ Kelly argues that his participation in the alleged deception did not occur until after the flights. The evidence indicated that Kelly told Angela Hicks to change the dates and knew the dates were wrong. The bills were then submitted through channels and paid. Kelly's participation occurred before payment for the flights and was instrumental in causing payment.

The Court of Appeals held the trial court erred in not granting appellees' motions for directed verdict. In ruling on a motion for directed verdict,

> the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187 (1991).

The appellate standard of review for a directed verdict is, "[i]f under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal." *Commonwealth v. Sawhill*, Ky., 660 S.W.2d 3, 5 (1983).

There was ample evidence from which it was not unreasonable for the jurors to find the appellees guilty. Accordingly, the opinion of the Court of Appeals is reversed, and the final judgments entered by the trial court are affirmed.

REYNOLDS, STUMBO and WINTERSHEIMER, JJ., concur.

JERRY GILBERT, Special Justice, dissents by separate opinion in which LAMBERT and SPAIN, JJ., join.

JERRY W. GILBERT, Special Justice, dissenting.

Respectfully, I dissent.

In order to establish a theft by deception, it must be shown that a defendant obtained something to which he was not otherwise entitled. *Palmer v. Commonwealth*, Ky., 479 S.W.2d 613 (1972). The offense is not established if the "victim" of the offense received what was bargained for or if predicated upon matters which have no pecuniary significance. *Sanson v. Commonwealth*, 313 Ky. 631, 233 S.W.2d 258 (1950); *Rowland v. Commonwealth*, Ky., 355 S.W.2d 292 (1962); and *Davis v. Commonwealth*, Ky.App., 564 S.W.2d 33 (1978). Nor is the offense established without proof of reliance by the "victim" on the alleged deception or misrepresentation. *Brown v. Commonwealth*, Ky., 656 S.W.2d 727 (1983). In short, where an alleged deception did not cause the theft or was not the means of the theft, there can be no theft by deception.

Clearly, as pointed out by the majority opinion, sufficient proof was adduced at trial for a reasonable juror to believe beyond a reasonable doubt that Burnette, Wolf, and Kelly acted to deceive in submitting the invoices containing the false dates. However, there must also be sufficient proof of the same nature that the Commonwealth relied upon the deception in rendering payment. *Brown v. Commonwealth, supra*. In this regard, there is an absence of proof that the flights were not for the purpose of promoting

the agricultural interest of Kentucky or that the Commonwealth would not have paid for the flights had the actual dates been revealed. It was the Commonwealth's burden to adduce this proof, and it failed to do so.

At the time of the flights, Burnette was Commissioner–Elect of the Department of Agriculture. The flights involved were for the stated purpose of obtaining information and contacts for the potential establishment of a hay program and international marketing office in Kentucky. Reimbursement for travel expenses by the state is not limited to state employees, but rather includes those "persons in the official service of the Commonwealth." 200 KAR 2:006, Sec. 2(3). There is no proof that the flights were not made for a public purpose, and therefore were subject to payment by the state. Again, this was the Commonwealth's burden to prove.

Despite the Commonwealth's reliance on the false flight dates as the only evidence of misrepresentation or deception by the defendants, the state finance officials testifying at trial stated that the dates on the invoices were not the determining factor in authorizing payment. Roger Wells, Secretary of Finance and Administration, specifically testified that the false dates were of no consequence, and he would have authorized payment even if the had known that the flights occurred in 1987. The Secretary of Finance is the chief financial officer of the state and is charged with the ultimate decision whether travel expenses are to be reimbursed by the Commonwealth. KRS 42.012. Under 200 KAR 2:006, Sec. 2(4) the Secretary's interpretation of the regulations involving travel expense and reimbursement is final.[1] The Secretary's testimony concerning whether he would authorize the payment of the invoices knowing the flights occurred in 1987 was as follows:

Q. If those facts had been presented to you that the trip had been in December and all these other facts that I've mentioned and those facts had been presented to you, would you have authorized the payment of that bill, assuming that it was up to you to do that?

A. Yes, sir.

Q. And under the regulations, you have the right to declare whether or not there should be a reimbursement for travel expenses based upon all these conditions that we've spoken about, have you not, sir?

A. Yes, sir.

Q. And would you, sir, certify that the travel expenses should have been reimbursed under those circumstances that I have described to you?

A. Yes, sir.

Q. All right. When I say "reimbursed", I mean paid to the person that has the money coming; is that correct, sir?

A. With proper documentation, the invoice would have been paid, yes sir.

Q. All right. And if that trip had been taken without getting a prior approval from military affairs, it could still be paid for, even though that didn't take place and they get subsequent approval; isn't that correct, sir?

A. That is correct, sir.

Q. And that would be your official interpretation of the state's right to pay this bill; is that correct, sir?

THE WITNESS: That would be my official interpretation?

MR. HADDAD: Yes, sir.

A. As secretary of finance cabinet—

MR. HADDAD: Yes.

A. —I would have approved the bill had I known the facts as I understand them from the testimony.

Q. Even though the trip was in December?

A. That wouldn't have had any bearing on it.

From the foregoing, it is clear that, irrespective of the leading nature of the questions to Mr. Wells, ("if the facts were as the defense attorneys put them ...," Majority Opinion at ——), the proof was that *the bill would have been paid regardless of the incorrect date.*

1. "All final interpretations of this Regulation shall be made by the Secretary of Finance and Administration, and such determination shall be final and conclusive."

The Commonwealth is charged with proving every element of the offense beyond a reasonable doubt. No witness testified that any state official relied on the erroneous flight dates in the determination to issue payment. No witness testified that the invoices would not have been paid had the correct dates been known. In fact, the proof was to the contrary.

The reliance of the Majority Opinion on *Raney v. Stovall,* Ky., 361 S.W.2d 518 (1962) disregards the distinguishing facts upon which that decision was founded. *Raney* should be specifically limited to the authority of a public officer to question the validity of a claim against the state and refuse to disburse public funds on the ground that to do so would violate the constitution. It is not alleged, nor proven, that in this case the payment of the invoices would be violative of the Kentucky Constitution. KRS 42.012 and 200 KAR 2:006, Sec. 2(4) clearly authorize the Secretary of Finance to conclusively determine the payment of travel expenses and reimbursement.

There being no evidence upon which a reasonable jury could find the false flight dates were relied on by the Commonwealth to issue payment for the flights, I would hold that the trial court improperly overruled the defendant's motion for directed verdict and would affirm the Court of Appeals.

LAMBERT and SPAIN, JJ., join in this dissent.