T.C. Memo. 1996-118


UNITED STATES TAX COURT


MTS INTERNATIONAL, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


ROBERT C. HUGHES III, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 2161-93, 2247-93.[1]        Filed March 12, 1996.


<u>Gary L. Goble</u>, for petitioners.

<u>Frederick W. Krieg</u> and <u>D. Lyndell Pickett</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in

petitioners' Federal income tax and additions to tax as follows:

―――――――――――――――――――

[1] These cases were consolidated for purposes of trial,
briefing, and opinion.

### MTS International, Inc.

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a) | Sec. 6653(a)(1)(A)[1] | Sec. 6661 |
| 1987 | $217,716 | $54,429 | $10,885 | $54,429 |

[1] Respondent determined an addition to tax under sec. 6653(a)(1)(B) of 50 percent of the interest due on $217,716 for 1987.

### Robert C. Hughes III

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1)(A)[1] | Sec. 6661 |
| 1986 | $31,740 | $13,179 | $3,236 | $7,935 |
| 1987 | 202,446 | 49,951 | 11,190 | 50,612 |

[1] Respondent determined additions to tax under sec. 6653(a)(1)(B) of 50 percent of the interest due on $31,740 for 1986, and 50 percent of the interest due on $202,446 for 1987.

After concessions, the issues for decision are:

1.  Whether the loss petitioner Robert C. Hughes III sustained when he sold ZZZZ Best Co. stock in 1987 is deductible as a theft loss.  We hold that it is not.

2.  Whether petitioner Robert C. Hughes III's withdrawals from petitioner MTS International, Inc. (MTS), and what petitioners contend was its forgiveness of his debts were constructive dividend income to him in the amount of $194,224 in 1987.  We hold that they were, except as discussed below.

3.  Whether petitioner MTS International, Inc., may deduct $196,672 for travel and entertainment expenses for 1987.  We hold that it may not.

References to petitioner are to Robert C. Hughes III. References to petitioner corporation are to MTS International, Inc.  Section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.  <u>Petitioner and Petitioner Corporation</u>

Petitioner resided in Prospect, Kentucky, when he filed the petition in this case.

Petitioner corporation had its principal place of business in Louisville, Kentucky, during the years in issue.  Petitioner has been the sole shareholder, director, and president of petitioner corporation at all times since it was incorporated. Petitioner controlled petitioner corporation, including its financing, dividends, and loans.

Petitioner corporation was in the business of collecting debts for creditors.  It was also in the factoring business; i.e., it bought accounts receivable from businesses for a percentage of face value and then tried to collect the receivables.

B.   Petitioner's Dealings With ZZZZ Best Co.

   1.   1986

In early 1986, petitioner advertised in the Los Angeles Times for businesses that wanted to factor receivables.  Barry Minkow (Minkow), the president of ZZZZ Best Co., Inc. (ZZZZ Best), in Los Angeles, saw the ad and contacted petitioner. Petitioner and Mark Morze (Morze), Minkow's accountant, met in Los Angeles in April or May 1986 to discuss petitioner's purchase of ZZZZ Best receivables.  Morze gave him balance sheets, operating statements, press clippings on Minkow and ZZZZ Best, and other documents purporting to show the financial strength of Minkow and ZZZZ Best.  Petitioner and Minkow spoke several times during the summer of 1986 about petitioner corporation's possible purchase of ZZZZ Best receivables.  ZZZZ Best claimed to perform insurance restoration work on buildings damaged by water and fire.

Minkow knew the receivables were fraudulent and that ZZZZ Best's financial statements contained false information about its profitability.  Minkow needed capital in 1986 because he frequently borrowed from one investor to repay another investor. On July 10, 1986, Minkow sent documents to petitioner from Interstate Appraisal Services (Interstate) purporting to show that ZZZZ Best's accounts receivable were legitimate.  Petitioner examined ZZZZ Best's financials and the Interstate documents in

July and August 1986, but could not verify the amount of receivables. Petitioner analyzed the financials and bank statements Morze gave him and concluded that they did not make financial sense.

In December 1986, ZZZZ Best went public. Its stock began to be publicly traded on the National Association of Securities Dealers Automated Quotations (NASDAQ).

2.  1987

By April 1987, petitioner thought that Minkow and ZZZZ Best stock were legitimate because of the December 1986 public offering of ZZZZ Best stock, Minkow's appearances on talk shows and in business magazines, and other institutions' purchases of ZZZZ Best stock. Petitioner bought 60,000 shares of ZZZZ Best common stock for $912,560.69 in early April 1987. He sold the 60,000 shares on or before April 15, 1987, for $1,014,621.75, resulting in a profit of $102,061.06.

Minkow spoke with petitioner frequently from late April to mid-June 1987 to encourage petitioner corporation to buy $1,269,328.80 of ZZZZ Best receivables. Minkow thought petitioner might buy some of ZZZZ Best's receivables. Minkow told petitioner that ZZZZ Best's stock was one of the best NASDAQ stocks, but he did not try to sell ZZZZ Best stock to petitioner.

Minkow held a press conference on May 28, 1987, to respond to a newspaper article alleging wrongdoings by him. He announced

that investigators who had reviewed allegations about a junk bond offering by ZZZZ Best through Drexel, Burnham & Lambert (Drexel, Burnham) found nothing wrong and that the offering would proceed. Drexel, Burnham ended its relationship with ZZZZ Best because Minkow's press conference violated rules regarding public offerings.

In early June 1987, ZZZZ Best stock was one of the most actively traded NASDAQ stocks. Petitioner believed that Minkow was one of the most prominent and successful entrepreneurs in the country at that time. From June 1 to June 4, 1987, petitioner bought 50,000 shares of ZZZZ Best stock for $532,161.40.

On June 4, 1987, shareholders of ZZZZ Best filed a class action suit against ZZZZ Best, Minkow, and others. In re ZZZZ Best Co. SEC Litigation, docket No. CV 87-3574 RSWL (Bx) (C.D. Cal.). Petitioner became a plaintiff in the shareholder class action suit at a time not specified in the record.

In mid-June 1987, Minkow was desperate to raise capital because banks had called his loans and ZZZZ Best stock had lost value due to negative press. On June 12, 1987, Minkow telefaxed a letter to petitioner purporting to confirm ZZZZ Best's sale to petitioner corporation of $1,189,874 in receivables for $600,000. ZZZZ Best did not sell its receivables to petitioner or petitioner corporation then or at any time.

On June 16, 1987, petitioner bought 20,000 shares of ZZZZ Best stock for $146,650.[2]  He paid a total of $678,811.40 for the 70,000 shares he bought in June.  He bought all of his ZZZZ Best stock through stockbrokers; i.e., Merrill Lynch and Drexel, Burnham.  He did not buy any ZZZZ Best stock from ZZZZ Best, Minkow, or any other officer or director of ZZZZ Best. Minkow did not try to sell ZZZZ Best stock to petitioner and did not encourage him to buy it.

Minkow telefaxed various documents to petitioner corporation on June 16, 1987.[3]  These included a Form 10-Q, undated ZZZZ Best financial statements, the May 28, 1987, press release concerning ZZZZ Best's future operations, a security agreement, Minkow's personal guarantee of the receivables, Minkow's personal financial statement (as of January 31, 1987), an irrevocable stock/bond power in which Minkow assigned to MTS 200,000 shares of restricted stock in ZZZZ Best, and documents from Interstate purporting to show that the accounts receivable were legitimate. Minkow also telefaxed a June 16, 1987, agreement to buy accounts receivable that included a blank signature line for petitioner

---

[2] The trade date of petitioner's purchase of the 20,000 shares of ZZZZ Best stock was June 16, 1987; the settlement date was June 23, 1987.

[3] Minkow telefaxed these documents to petitioner at 5 p.m. on June 16, 1987.  Petitioner did not try to show that he received these documents before he bought 20,000 shares of ZZZZ Best stock described above.

corporation (By: Robert Hughes, President). Minkow's and ZZZZ Best's financial statements were false.

Petitioner examined ZZZZ Best's financial statements in mid to late June 1987 and concluded that its balance sheets were unusually skewed toward accounts receivable. He believed that nearly 80 percent of ZZZZ Best's assets were receivables. He concluded that ZZZZ Best's "nominal balance" did not match the total amount of receivables. Petitioner corporation did not buy ZZZZ Best receivables because petitioner could not verify the source of the receivables.

On June 23, July 13, and July 24, 1987, petitioner sold the 70,000 shares of ZZZZ Best stock he bought in June. His sale price was $45,270.72, and his loss was $633,540.68.

C.   Minkow's Conviction and ZZZZ Best Class Action Suit

In June 1988, Minkow and other officers of ZZZZ Best were charged with the crimes of conspiracy, unauthorized use of access devices, money laundering, interstate transportation of stolen securities and money, and securities, mail, bank and tax fraud. Minkow was convicted early in 1989.

At various times not specified in the record, petitioner contacted the attorneys who represent the plaintiffs in the shareholder class action suit. A recovery agreement on the class action suit was reached in 1991. It was signed by the parties in July 1994.

D.   Petitioner Corporation's Transfer of Funds to Petitioner

Petitioner corporation transferred an amount of funds not specified in the record to petitioner before and during its 1987 tax year.  Petitioner corporation's minutes for April 15, 1981, stated that it would lend money to petitioner as needed at a 9-percent interest rate.  Petitioner corporation did not require and petitioner did not give collateral for any transfers of funds from petitioner corporation to him.  Petitioner did not pay interest to petitioner corporation on the transfers at issue or for any prior transfers.  There was no limit on the amount petitioner could borrow from petitioner corporation.  The purported loans had no maturity dates.  Petitioner executed no notes evidencing debt to petitioner corporation.

Petitioner corporation has never formally declared or paid dividends to petitioner.

E.   Petitioner's 1987 Tax Return

Petitioner filed his 1987 income tax return on June 14, 1989.  He claimed a $463,881 capital loss, and a long-term capital gain of $3,898, from his 1987 sales of 26 different securities, including Texaco, Exxon, Navistar, Crazy Eddies, Chi-Chi's, and ZZZZ Best.  The loss included a $531,480 net loss from his sales of ZZZZ Best stock.  He filed an amended 1987 return on

June 25, 1991, on which he claimed a $1,319,311 theft loss for the ZZZZ Best stock.[4]

Petitioner corporation filed a tax return for its 1987 tax year on January 3, 1989. It reported unappropriated retained earnings of $324,760 at the end of its 1987 tax year.

OPINION

A.   Theft Loss

1.   Background

Petitioner contends that he may deduct the loss on his investment in ZZZZ Best stock as a theft loss for 1987.

Generally, a taxpayer may deduct a theft loss in the year in which the taxpayer discovers the loss. Sec. 165(a), (e); Asphalt Indus., Inc. v. Commissioner, 411 F.2d 13, 15-16 (3d Cir. 1969), affg. T.C. Memo. 1968-155. Whether there is a theft for purposes of section 165(e) is determined by applicable State law. Paine v. Commissioner, 63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975). A conviction for theft under State law is not required for a taxpayer to be eligible for a theft loss deduction. Vietzke v. Commissioner, 37 T.C. 504, 510 (1961). Petitioner bears the burden of proving that he is

---

[4] Petitioner did not explain how he figured the $1,319,311 theft loss amount. On brief, he claimed that he had a $531,480 theft loss when he sold ZZZZ Best stock. This is the amount we treat as in dispute.

entitled to deduct a theft loss.  Rule 142(a);  <u>Welch v.</u>
<u>Helvering</u>, 290 U.S. 111, 115 (1933).

The parties agree that Kentucky law applies here.
Petitioner points out that Minkow knowingly misrepresented the
value of the ZZZZ Best receivables and stock to petitioner and
argues that Minkow's conduct was theft by deception under
Kentucky law.

2.    <u>Theft by Deception</u>

Section 514.040 of the Kentucky Penal Code, Ky. Rev. Stat.
Ann. sec. 514.040 (Michie 1990), provides that

Theft by deception. -- (1) A person is guilty of theft
by deception when he obtains property or services of
another by deception with intent to deprive him
thereof.  A person deceives when he intentionally:

(a) Creates or reinforces a false impression,
including false impressions as to law, value, intention
or other state of mind;

*      *      *      *      *      *      *

(c) Fails to correct a false impression which the
deceiver previously created or reinforced * * *

"Obtain" means "to bring about a transfer or purported
transfer from another person of a legal interest in the property,
whether to the obtainer or another".  Ky. Rev. Stat. Ann. sec.
514.010(4)(a) (Michie 1990).

For us to find that Minkow committed theft by deception,
petitioner must show that Minkow intentionally deprived
petitioner of property through deception or false representations

on which petitioner relied. Ky. Rev. Stat. Ann. sec. 514.040 (Michie 1990); Commonwealth v. Burnette, 875 S.W.2d 865, 868 (Ky. 1994); Brown v. Commonwealth, 656 S.W.2d 727, 728 (Ky. 1983).

Petitioner contends that he bought ZZZZ Best stock in reliance on Minkow's representations and material Minkow sent him. Petitioner contends that Minkow's intent to deceive him about the receivables also showed that Minkow intended to deceive him to buy ZZZZ Best stock. Petitioner argues that Minkow's fraudulent misrepresentation of the value of the receivables caused petitioner to buy ZZZZ Best stock. See Ky. Rev. Stat. Ann. sec. 501.060 (Michie 1990).[5]

---

[5] Sec. 501.060, Ky. Rev. Stat. Ann. (Michie 1990), provides in part:

Causal relationships. -- (1) Conduct is the cause of a result when it is an antecedent without which the result in question would not have occurred.

(2) When intentionally causing a particular result is an element of an offense, the element is not established if the actual result is not within the intention or the contemplation of the actor unless:
(a) The actual result differs from that intended or contemplated, as the case may be, only in the respect that a different person or different property is injured or affected or that the injury or harm intended or contemplated would have been more serious or more extensive; or
(b) The actual result involves the same kind of injury or harm as that intended or contemplated and occurs in a manner which the actor knows or should know is rendered substantially more probable by his conduct.

We are not convinced by petitioner's claim that he bought ZZZZ Best stock in reliance on Minkow's statements or the documents Minkow sent to him. Although Minkow made fraudulent misrepresentations about the receivables, petitioner did not rely on them. Petitioner had reservations about the receivables and did not buy them. Petitioner bought 60,000 shares of ZZZZ Best stock in early April 1987 because, based on ZZZZ Best's December 1986 public offering, publicity surrounding Minkow and ZZZZ Best, and other institutions' purchases of that stock, he thought it was a good investment. He sold that stock for a profit of $102,061.06 on April 15, 1987. Petitioner bought 50,000 shares of ZZZZ Best stock from June 1 to June 4, 1987, and 20,000 shares on June 16, 1987, also because he thought it would be a good investment.

Petitioner bought all 130,000 shares of ZZZZ Best stock at issue here before Minkow telefaxed various documents to him on June 16, 1987. Although Minkow talked frequently to petitioner on the phone from late April to mid-June 1987, he was trying to persuade petitioner to buy receivables, not stock. Minkow told petitioner that ZZZZ Best's stock was one of the best NASDAQ stocks after petitioner bought and sold 60,000 shares of it in early April 1987. Petitioner decided to buy ZZZZ Best stock based on his knowledge of ZZZZ Best's public offering, the active trading of ZZZZ Best stock, and Minkow's reputation as an

entrepreneur. His investment decision was not the result of Minkow's misrepresentations.

Petitioner points out that Minkow's repeated personal contacts with petitioner differentiate this case from most cases where an investor buys publicly traded stock. See, e.g., Paine v. Commissioner, 63 T.C. at 740; Crowell v. Commissioner, T.C. Memo. 1986-314; De Fusco v. Commissioner, T.C. Memo. 1979-230; Barry v. Commissioner, T.C. Memo. 1978-215. Petitioner maintains that he bought ZZZZ Best stock based not on his own analysis or that of a broker, but based on Minkow's intentional misrepresentations to petitioner. We disagree for the reasons stated above.

Petitioner has not shown that there was a theft under section 514.040 of the Kentucky Penal Code because Minkow did not try to convince petitioner to buy ZZZZ Best stock and because petitioner's decision to buy the stock was not made in reliance on Minkow's representations. Therefore, we conclude that petitioner may not deduct his loss on ZZZZ Best stock as a theft loss.

In view of our holding, we need not reach respondent's argument that petitioner had a reasonable prospect of recovery at the end of 1987.

B.   Petitioner's Dividend Income and Petitioner Corporation's
     Travel and Entertainment Expenses Deduction

     1.   Petitioner's Evidence

These cases were calendared for trial twice in Louisville. Five months before they were first calendared for trial, we sent a copy of the Court's standing pretrial order to petitioner. The standing pretrial order stated in part: "Any documents or materials which a party expects to utilize in the event of trial (except for impeachment), but which are not stipulated, shall be identified in writing and exchanged by the parties at least 15 days before the first day of the trial session."

Petitioner gave respondent envelopes containing some of his records 3 days before that trial session. The records were disorganized. Respondent immediately returned the records to petitioner so he could organize them. Petitioner did not return those records to respondent until the second time the cases were set for trial.

About 3 months before the trial of these cases, we ordered the parties to exchange all evidence to be offered at trial (except for impeachment purposes) 45 days before trial. We also told the parties that the Court may refuse to receive in evidence any document or material not stipulated or exchanged as required by this Court.

Four days before trial, petitioner again gave disorganized records to respondent. Respondent returned them to petitioner to organize them. Petitioner did not return those records to respondent before trial.

At trial, petitioner submitted several exhibits purporting to substantiate some of petitioner corporation's travel and entertainment expenses and petitioner's claim that he made cash advances to petitioner corporation. They were not admitted into evidence because they were not exchanged as required by our pretrial orders.[6] Materials not exchanged in compliance with our pretrial orders may be excluded from evidence. Rule 104(c)(2); Gleason v. Commissioner, T.C. Memo. 1990-110; see Freedson v. Commissioner, 565 F.2d 954 (5th Cir. 1978), affg. 65 T.C. 333 (1975) and 67 T.C. 931 (1977); McCoy v. Commissioner, 76 T.C. 1027 (1981), affd. 696 F.2d 1234 (9th Cir. 1983).

At trial, petitioner's counsel said that prior counsel for petitioner had told him that he submitted and withdrew for reorganization "voluminous documentation" around July 15, 1994. Respondent's counsel remembered receiving no such documents from petitioner. There is no corroboration of petitioner's counsel's secondhand report that prior counsel gave records to respondent in July 1994. Petitioners apparently accept respondent's counsel's account because they have not pursued this point further. Also, petitioner does not claim that he organized any of these records and gave them to respondent before these cases were tried.

---

[6] Petitioner refrained from offering numerous documents into evidence after we did not admit other exhibits that were not exchanged before trial.

2. Dividend Income

Respondent determined that petitioner had dividend income from petitioner corporation in 1987 as follows:

|  |  |
|---|---|
| Debt cancellation (forgiveness of debt) | $130,230 |
| Use of property and loans (increase in loan by 6/30/87) | 346,381 |
| Total | 476,611 |

Respondent conceded that $132,387 of this amount was an MTS bookkeeping error and that $150,000 was transfers from petitioner to petitioner corporation. The parties continue to dispute whether petitioner received $194,224 of dividend income.

Petitioner bears the burden of proving that these payments were not dividend income. Rule 142(a); Welch v. Helvering, 290 U.S. at 115. A dividend is a distribution of property by a corporation to its shareholders from its earnings and profits. Sec. 316(a). Gross income includes dividends. Sec. 61(a)(7).

Petitioner contends that he made unreimbursed cash advances, including mortgage payments, on petitioner corporation's behalf. He said that he thought the amount of the cash advances was "around $30,000". Petitioner's only evidence on this issue was his vague testimony.

Petitioner's documents, which we discussed above at par. B-1 (pp. 14-15), included one check which was in the amount of $1,590.53 and purported to be a mortgage payment written by

petitioner for petitioner corporation, and various hotel, restaurant, and transportation receipts which lacked complete dates (i.e., the year was missing), or failed to adequately show the business purpose or to show that the statement of business purpose was made contemporaneously. Even if we had admitted petitioner's exhibits, they would not have substantiated petitioner's claim that he made payments to or on behalf of petitioner corporation.

Petitioner offered no evidence that the debts were not canceled, that he did not make withdrawals from petitioner corporation, that the amounts were repaid, or that the withdrawals and debt cancellations were not taxable dividends to him. Sec. 6001; Rule 142(a). Petitioner's records were totally inadequate to convince us that he made unreimbursed payments of mortgage and other expenses of petitioner corporation. However, petitioner's testimony convinces us that he made some cash advances to petitioner corporation. We find that $30,000 of the $194,224 in dispute was not dividends from petitioner corporation to petitioner.

Petitioner corporation had retained earnings in 1987 of $324,670, which is enough to establish that the cash advances to petitioner were dividends. Sec. 316(a). Petitioner has not shown that petitioner corporation did not have enough retained earnings to support respondent's determination that he received

dividends from petitioner corporation. We conclude that petitioner had dividend income of $164,224 in 1987.

3.  Travel and Entertainment Expenses

Respondent disallowed $196,672 claimed by petitioner corporation as travel and entertainment deductions. Respondent's determination is presumed to be correct, and petitioner corporation bears the burden of proving otherwise. Rule 142(a); Welch v. Helvering, supra at 115.

As discussed above at par. B-1 (pp. 14-15), we did not admit into evidence petitioner's exhibits purporting to substantiate some of petitioner corporation's travel and entertainment expenses. Also, petitioner did not offer numerous other documents also purporting to substantiate travel and entertainment expenses. Even if the documents offered by petitioner were in evidence, the exhibits (consisting mainly of expense reports and Xerox copies of hotel, restaurant, and other receipts) did not adequately substantiate any of petitioner corporation's travel and entertainment expenses. Most of them did not indicate the business purpose for the expense. Petitioner did not testify about the travel and entertainment expenses. Thus, there is no evidence that petitioner corporation incurred travel and entertainment expenses, the amount thereof, or the business purpose for the expenses. Secs. 6001, 274; Rule 142(a). Petitioner corporation did not address this issue on

brief.  Petitioner corporation has not carried its burden of proving that it may deduct travel and entertainment expenses.

To reflect the foregoing and concessions,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.